**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DEBORAH ANN CUEVAS MONCAYO,**

                **Plaintiff,**

  vs.                                         **1:14-cv-00855**
                                             **(MAD/TWD)**

**CAROLYN COLVIN,** *Acting Commissioner of Social Security,*

                **Defendant.**
_____

**APPEARANCES:**                               **OF COUNSEL:**

**EMPIRE JUSTICE CENTER - ALBANY**      **LOUISE MARIE TARANTINO, ESQ.**
119 Washington Avenue
2nd Floor
Albany, New York 12210
Attorney for Plaintiff

**LEGAL AID SOCIETY OF NORTHEAST**     **MICHAEL J. TELFER, ESQ.**
**NEW YORK - ALBANY**
55 Colvin Avenue
Albany, New York 12206
Attorney for Plaintiff

**NEW YORK STATE SCHOOL BOARD**       **SHUBH NIGAM MCTAGUE, ESQ.**
**ASSOCIATION**
24 Century Hill Drive
Suite 200
Latham, New York 12110
Attorney for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**    **SERGEI ADEN, ESQ.**
**OFFICE OF REGIONAL GENERAL**
**COUNSEL REGION II**
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

# MEMORANDUM-DECISION AND ORDER

**I. INTRODUCTION**

Plaintiff commenced this action on July 15, 2014, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a decision by the Commissioner of Social Security denying Plaintiff's application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). *See* Dkt. No. 1 at 1. On August 21, 2012, Plaintiff filed an application for DIB and SSI, alleging a disability onset date of September 18, 2004. *See* Dkt. No. 1 at 2; *see also* Dkt. No. 10-2 at 20. The application was denied on February 20, 2013. *See* Dkt. No. 10-2 at 20. Plaintiff then requested a hearing and appeared with her counsel before Administrative Law Judge ("ALJ") Arthur Patane on December 20, 2013. *See id.* at 37. On February 21, 2014, ALJ Patane issued a decision denying Plaintiff's application, finding her not disabled. *See id.* at 20-29. Plaintiff subsequently requested review by the Appeals Council and was denied such review on May 20, 2014, making the ALJ's decision the Commissioner's final decision. *See* Dkt. No. 1 at 3; *see also* Dkt. No. 10-2 at 2-4.

Presently before the Court are Plaintiff's motion to remand for further administrative proceedings, and Defendant's motion to remand for further administrative proceedings regarding consideration of Plaintiff's residual functional capacity and motion for judgment on the remaining issues. *See* Dkt. Nos. 18, 20.

**II. BACKGROUND**

Plaintiff was born on November 11, 1963 and was 48 years old on May 1, 2012, which is when her DIB and her SSI were terminated. *See* Dkt. No. 10-2 at 28; Dkt. No. 18 at 1. Before September 18, 2004, Plaintiff worked at the New York City Department of Corrections, and left due to a medical separation. *See* Dkt. No. 18 at 2 (citation omitted). Plaintiff subsequently "received Worker's Compensation benefits from May to September 2004," when

2

"she was granted DIB." *See id.*

Plaintiff testified she was granted DIB in 2004 because she had asthma and anaphylactic shock. *See* Dkt. No. 18 at 4. In August and September 2009, Plaintiff was diagnosed with major depressive disorder and bipolar disorder I mixed moderate from visits she made to Elmhurst Hospital Center ("EHC"). *See* Dkt. No. 18 at 4-5; Dkt. No. 10-8 at 61-62, 70, 75. She began suffering from depression due to the deaths of her husband, mother, and older brother, which occurred all within 2008 to 2009. *See* Dkt. No. 18 at 4; *see also* Dkt. No. 10-2 at 48; Dkt. No. 11-1 at 9, 15; Dkt. No. 11-3 at 100. During a March 11, 2010 evaluation, Plaintiff said the death of her mother, father, husband and dog all occurred within one year of 2008. *See* Dkt. No. 11-1 at 9, 28. On March 15, 2010, during an examination Plaintiff reported that her husband passed away one year ago, her father two years ago, and her mother passed, but did not report how long ago it was and made no mention of her brother. *See id.* at 10. During an April 3, 2013 examination, Plaintiff stated she had one brother who passed away twenty years ago. *See* Dkt. No. 10-7 at 210. In a May 27, 2011 progress note, Plaintiff states she "had fight with brother and stepfather two days ago and punched someone." *See* Dkt. No. 11 at 91.

Plaintiff was held for observation at EHC on March 11, 2010, on Comprehensive Psychiatric Emergency Program ("CPEP") admission because she complained of feeling depressed and having suicidal ideation, and was found unable to care for herself. *See* Dkt. No. 11-3 at 79-87, 91-109; Dkt. No. 11-1 at 26-33. Plaintiff was voluntarily admitted to EHC to undergo treatment for her depression and inability to care for herself on March 15, 2010. *See* Dkt. No. 11-1 at 5-25, 34-55, 63-65, 88-95; Dkt. No. 11-3 at 77-79, 88-90, 112-113, 123-142. She was diagnosed with asthma, and sarcoidosis, and reported she smokes "one pack a day." *See* Dkt. No. 11-3 at 106, 108. Plaintiff reported to be receiving her DIB as of March 15, 2010 and

March 26, 2010.  *See* Dkt. No. 11-1 at 1112-1113, 1157.

On September 12, 2010, Plaintiff was admitted to New York Hospital Queens and diagnosed with asthma exacerbation and was given prednisone and albuterol.  *See* Dkt. No. 10-7 at 82-105.  She was diagnosed at EHC on September 13, 2010 with intrinsic asthma, with acute exacerbation, and tobacco use disorder.  *See* Dkt. No. 11-3 at 62-63; *see also* Dkt. No. 10-8 at 123-143.  Plaintiff's brief says she was diagnosed with bronchitis, but they have confused the diagnosis section of the medical report with the Diagnosis-Related Group ("DRG") classification.  *See* Dkt. No. 18 at 6; *See* Dkt. No. 11-3 at 62.  Plaintiff was prescribed Prednisone, Levaquin, Albuterol, Atrovent Inhaler and Nicotine patch.  *See* Dkt. No. 11-3 at 76.  During this examination she was also found to have edema rhinitis and anxiety.  *See* Dkt. No. 10-8 at 127-128.

Plaintiff reported having stable housing at this time on September 13, 2010.  *See* Dkt. No. 10-8 at 139.  The record also shows that she was sent monthly correspondence from the Social Security Administration ("SSA") from January 2010, to June 2010; August 2010, to October 2010; December 2010 to March 2011; May 2011 to June 2011; August 2011; October 2011 to November 2011; and January 2012 to April 2012.  *See* Dkt. No. 10-3 at 24-83.  The correspondence stated that she had not cashed her checks from October 2008 to March 2009; May 2009 to July 2009; September 2009 to December 2009; February 2010 to March 2010; May 2010; July 2010 to August 2010; and October 2010 to January 2011.  *See id.*

On January 13, 2011, Plaintiff reported "that she had followed through on social security paperwork to reestablish access to her check and medicaid."  *See* Dkt. No. 11 at 125.  Plaintiff also requested assistance from her therapist on December 28, 2011, to obtain "documents, access to social security and medicare" *See* Dkt. No. 11 at 120.  On April 24, 2012, while at EHC

4

Plaintiff stated she "wanted assistance verifying status of social security disability." *See* Dkt. No. 10-7 at 43; Dkt. No. 10-9 at 75.

On January 5, 2011, an inquiry was made about Plaintiff's discharge from a stay at the Family Justice Institute, a domestic violence shelter. *See* Dkt. No. 11 at 121. Her "[t]herapist contacted shelter staff and was informed that patient was administratively discharged and that she did not have grounds for a domestic violence services because she did not have proof of a recent incident with evidence of ongoing risk. The grounds were related to her interpersonal behavior and negative interactions with staff including argumentativeness and emotional reactivity." *See id.* Practitioners at EHC had a phone consultation with Ms. Jacobs at the Family Justice Institute on January 9, 2011, who stated that Plaintiff "had been identified as a person who is alleging domestic violence for the purposes of receiving services. [Ms. Jacobs] recommended caution regarding ongoing attempts to make reports and did not provide additional information or the basis of her report other than citing patient's verbalizations regarding need of services and scattered communication when dealing with police and providers." *See id.* at 123.

On January 24, 2011, Plaintiff visited EHC and was diagnosed with major depressive disorder and mood instability. *See id.* at 121-129. She "acknowledged partial compliance with medication." *See id.* On May 22, 2011, she was diagnosed as having a panic disorder. *See id.* at 29-50. An EHC Progress record cited mood instability, "suicidality," depression and anxiety. *See id.* 93-106, 133-135. Plaintiff reported that she was living at a domestic violence shelter on September 2, 2011, and transferred to Starbright Shelter, a medical shelter in Brooklyn, New York, on September 16, 2011. *See id.* at 102, 104. An EHC report states that Plaintiff required ongoing treatment for chronic mental illness as of November 4, 2011. *See id.* at 136. Plaintiff mentioned in a Progress Record about needing to "take back control of her documentation" on

November 4, 2011. *See id.* at 111. She mentioned abuse by her current husband on December 1, 2011. *See id.* at 112. Plaintiff was admitted to EHC for a four day stay from December 12, 2011, to December 16, 2011, for exacerbation of asthma. *See* Dkt. No. 10-7 at 27-28; Dkt. No. 10-8 at 193; Dkt. No. 10-9 at 2-17; Dkt. No. 11 at 2-22, 118.

A letter from the SSA dated May 25, 2011, stated that Plaintiff had not returned information requested, and if that information was not submitted by May 2012, Plaintiff would have to file a new application for Social Security DIB. *See* Dkt. No. 10-3 at 54-56. The notice also stated that the SSA would be sending a "bill for the premiums within a month," and "[e]ach bill after that will be for a 3-month period." *See id.* Plaintiff contacted the SSA and scheduled an appointment for October 13, 2011, and received a notice from the SSA on September 21, 2011 confirming that appointment. *See id.* at 61-62. In a notice dated October 4, 2011, the SSA stated that Plaintiff's Medicare premium for medical insurance was not paid within the time limit and her medical insurance coverage was terminated in September 2011, but her hospital insurance coverage would continue. *See id.* at 63-65.

Plaintiff was admitted to EHC on February 11, 2012. *See* Dkt. No. 11-4 at 33-44. On February 13, 2012, Plaintiff was transferred to Gracie Square Hospital under involuntary psychiatric admission for several days because she was a "[s]ubstantial danger to self or others", and diagnosed with Schizoaffective disorder. *See id.* at 46-74; *see also* Dkt. No. 11-4 at 24-45.

On March 7, 2012, Plaintiff was held for observation at EHC. *See* Dkt. No. 11-1 at 97-124; Dkt. No. 11-4 at 2-23. On April 24, 2012, she was admitted to EHC with worsening depression and suicidal ideation as an involuntary psychiatric patient and was discharged on May 14, 2012, after being diagnosed as having mood disorder, bipolar I disorder mixed moderate, and asthma. *See* Dkt. No. 10-7 at 5-26, 40-45, 51-72; Dkt. No. 10-9 at 92-139; Dkt. No. 11-2 at 4-73;

6

Dkt. No. 11-3 at 2-38. The report stated that "[d]espite her difficulties on medication her mania, paranoia and suicidal thoughts resolved." *See* Dkt. No. 10-7 at 42. It was also reported that Plaintiff had "[b]ipolar DO mixed with psychotic features [was] in early remission." *See id.* at 43. Upon discharge Plaintiff "signed consent for formal shelter referral through the Department of Homeless Services because she could not identify anyone with whom she could live." See id. at 44.

A letter from the SSA was sent to Plaintiff on May 4, 2012, advising her that she no longer qualified for Social Security DIB and that her hospital insurance coverage under Medicare would be terminated as well. *See* Dkt. No. 10-3 at 78. On May 11, 2012, Plaintiff contacted the SSA and scheduled an appointment for June 4, 2012. See id. at 80-81. Correspondence sent by the SSA on June 4, 2012, advised Plaintiff that before they could decide if she was entitled to Social Security Benefits, she must file an application, and that if she did not file an application immediately she could lose her benefits. *See id.* at 82-83. A second letter sent by the SSA on June 4, 2012 stated that

> [o]n May 11, 2012, we talked with you about your eligibility for Supplemental Security Income (SSI). We set up an appointment for June 4, 2012. However, you did not keep this appointment, and we were unable to reach you to set up a new appointment. Therefore, we have made an informal decision that you are not eligible for SSI. This informal decision is only about your eligibility for SSI. This decision is not about eligibility for Social Security benefits or Medicare.

*See* Dkt. No. 10-5 at 24-25. Explaining their reasons in this correspondence for Plaintiff's ineligibility, the SSA stated to her that "[y]ou told us you do not want to file a claim for SSI," and "[y]ou did not file an application for SSI." See id. Additional letters sent by the SSA on July 2, and July 27, 2012, informed Plaintiff she needed to file an application. *See id.* at 28-29, 32-33. Appointments were made and rescheduled several times as indicated by the SSA's

7

correspondence around this time. *See id.* at 26-27, 30-31. On October 4, 2012, Plaintiff completed a new application for Social Security Benefits. *See id.* at 2-3, 36-37, 40-41. Plaintiff completed a second application for Social Security Benefits on January 29, 2013. *See id.* at 42-43. On November 29, 2012, Plaintiff saw both Dr. Toula Georgiou and Dr. Joyce Graber for a psychiatric evaluation and an internal medicine examination respectively. *See* Dkt. No. 10-7 at 73-76. Plaintiff traveled twenty minutes by taxi to the evaluation with Dr. Georgiou. *See id.* at 73. Plaintiff reported to Dr. Georgiou that "[s]he is able to dress, bathe, and groom, manage her own money, and use public transportation. She is capable of cooking, cleaning, laundry, and shopping. However, she finds it difficult to complete tasks and stay focused because of her anxiety." *See id.* at 75. Dr. Georgiou also made the observation that "[s]he is able to follow and understand simple directions and instructions, perform simple tasks independently, attend and concentrate on simple tasks. She may have difficulty with maintaining a regular schedule, having to perform complex tasks at times, and dealing with stress. The results of the present evaluation appear to be consistent with psychiatric difficulties that may significantly interfere with the claimant's ability to function on a daily basis." *See id.* He then diagnosed Plaintiff with having bipolar disorder, post-traumatic stress disorder ("PTSD"), diabetes, and asthma. *See id.* On the same day, November 29, 2012, Plaintiff also saw Dr. Joyce Graber reported that "[s]he does not do any cleaning, laundry or shopping. She showers and dresses herself." *See id.* at 78. Dr. Graber also indicated that Plaintiff "appears to be in no acute distress. Gait normal. Can walk on heels and toes without difficulty. Squat full. Stance is normal. Uses no assistive devices. Needs no help changing for exam. Needs no help getting on and off exam table. Able to rise from chair without difficulty." *See id.* Dr. Graber concluded that Plaintiff "has no physical limitations." *See id.* at 79. During later treatment with Nurse Practitioner

("NP") Jessica Halse and Licensed Masters Social Worker ("LMSW") Amanda Keller from May 2, 2013 to November 27, 2013, Plaintiff also reported that her leisure activities included cleaning and cooking. *See id.* at 216, 220, 225, 229, 234, 239.

On February 20, 2013, consultative examination was done by T. Harding, Ph.D and Disability Adjudicator Robert Krome III, SDM. *See* Dkt. No. 10-3 at 4-23. It was found that Plaintiff's physical disability allegations were non-severe. *See id.* at 8. Dr. Harding found that Plaintiff's restriction of activities of daily living were mild; her difficulties in maintaining social functioning were mild; difficulties in maintaining concentration, persistence, or pace were moderate; ability to carry out very short and simple instructions were not significantly limited; ability to carry out detailed instructions were moderately limited; and her "mood and anxiety symptoms may create some difficulties managing workplace change." *See id.* at 8-11.

Plaintiff went to Northeast Health Behavioral Health Services on April 3, 2013, and was diagnosed with PTSD, depressive disorder, asthma, sarcoidosis, severe allergies, and borderline diabetic in an evaluation signed by NP Halse and Dr. Charles VanMeter. *See* Dkt. No. 10-7 at 197-205, 207-213. Plaintiff stated during this evaluation that "[s]he is currently thinking about pursuing a certification as a home health aide or a CNA so she can begin working again more quickly." *See id.* at 211. NP Halse and LMSW Keller met with Plaintiff regularly from April to August 2013. *See id.* at 214-241. LMSW Keller identified Plaintiff's problems as PTSD, depression, difficulty managing stress, flashbacks and intrusive memories, hypervigilance and suspicion, difficulty trusting others, rumination and worry, panic attacks, "somatic symptoms such as nausea and vomiting when anxious, anger and irritability, feelings of frustration and hopelessness, feelings of grief, emotional numbness, difficulty thinking clearly, decreased appetite and insomnia." *See id.* at 218, 237. On July 19, 2013, NP Halse reported on Plaintiff's

9

mental status and found that she was well oriented in all spheres, appeared alert, psychomotor activity was at a normal level of movement and activity, no conceptual disorganization was present, she was preoccupied with external stressors, attitude was defensive, she verbalized awareness of problems and could see consequences, judgment was fair, attention and concentration were characterized as having the ability to maintain focus and attention. *See id.* at 234.

On July 15, 2013, a Psychiatric Evaluation Form was filled out by NP Halse and LMSW Keller after seeing Plaintiff twice a month beginning on April 3, 2013. *See id.* at 197. They reported that Plaintiff exhibited several marked or extreme impairments in social functioning and in concentration that resulted in "her frequent failure to complete tasks in a timely manner," and found no marked or extreme impairments in daily living activities. *See id.* at 201-203. Symptoms related to Plaintiff's impairments in social functioning included communicating clearly and effectively; getting along with friends; getting along with neighbors; getting along with strangers, such as grocery clerks or bus drivers; cooperating with others; initiating social contact; responding to those in authority; establishing interpersonal relationships; avoiding altercations; and interacting and actively participating in group activities. *See id.* at 202. They also found Plaintiff's anxiety and panic attacks to be related to her PTSD. *See id.* at 198-199. The evaluation also stated that Plaintiff experienced, in relation to her depressive syndrome, anhedonia (the loss of interest in almost all activities), sleep disturbance, decreased energy, feelings of guilt and/or worthlessness, and difficulty concentrating or thinking. *See id.* at 197. They did not find Plaintiff to have bipolar syndrome. *See id.* at 198. They also found the Plaintiff to have "recurrent and intrusive recollections of a traumatic experience that are a source of marked distress." *See id.* at 200. Related to this finding, they noted that Plaintiff's symptoms included persistent avoidance of

10

stimuli related to the trauma; efforts to avoid thoughts, feelings or conversations associated with the trauma; efforts to avoid activities, people or places that arouse recollections of the trauma; markedly diminished interest or participation in significant activities; feeling of detachment; feeling of estrangement from others; restricted range of affection; sense of foreshortened future; recurrent distressing dreams of the event; acting or feeling as if the traumatic event were recurring; flashbacks to the event; intense psychological distress at exposure to internal or external cues that symbolize the trauma; physiological reactivity on exposure to internal or external cues. See id. at 201. It was also reported that Plaintiff's mental condition lasted, or could be expected to last, at least 12 months. *See id.* at 204.

On May 21, 2013, Plaintiff consulted with Gastroenterologist Yogesh Gupta who recommended she have a CT scan of her abdomen and pelvis. *See id.* at 183-190. The CT scan showed that Plaintiff had a fatty liver and a cyst. *See id.* at 189-190. Plaintiff also had an allergic reaction to the contrast dye used in the CT scan procedure, but it was treated immediately. *See id.* at 242.

On June 20, 2013, Plaintiff saw Dr. David Shulan who performed a spirometry test and found a moderate restrictive pattern of breathing present, and he diagnosed Plaintiff with recurrent pruritus (itchy skin), anaphylaxis of uncertain etiology, and allergic rhinitis. *See* Dkt. No. 10-8 at 194-196, 256-258, 294. Dr. Shulan also suggested that Plaintiff be evaluated by a pulmonologist for COPD with chronic bronchitis and by an otolaryngologist for vocal cord dysfunction and vocal cord polyps. *See id.* at 194-196, 256-258.

Plaintiff established Dr. Faith Cruz as her new primary care physician on June 26, 2013, and saw Dr. Cruz for a pre-op and post-op medical evaluation for a hysterectomy. *See id.* at 39-53. On July 8, 2013, Plaintiff underwent a hysterectomy which was scheduled to be laproscopic

11

but was converted to open because multiple adhesions were found in the anterior abdominal wall. *See id.* at 2-3, 8-15. During the post-op examination, Plaintiff was diagnosed as having an allergic reaction to an unknown allergen and given an injection for it. *See id.* at 42.

### III. DISCUSSION

**A.    Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). The Court must examine the administrative transcript to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and quotation marks omitted).

If supported by substantial evidence, the Commissioner's factual determinations are conclusive, and it is not permitted for the courts to substitute their analysis of the evidence. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) (stating that the Court "would be derelict in our duties if we simply paid lip service to this rule, while shaping [the Court's] holding to conform to our own interpretation of the evidence"). In other words, this Court must afford the

Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

For purposes of both DIB and SSI, a person is disabled when he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There is a five-step analysis for evaluating these disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the [Social Security Administration] bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (internal citations omitted)).

**B.     The ALJ's Decision**

The ALJ stated that "the evidence does not show that the claimant appealed the decision to terminate her benefits," and consequently considered the period of disability from March 2005, to May 2012, "as a matter of administrative finality." *See* Dkt. No. 10-2 at 20. The ALJ, therefore, proceeded to make a determination of whether the Plaintiff had been disabled from the day after her benefits were terminated, May 1, 2012, to the date of his decision on February 21, 2014. *See id.*

13

The ALJ found that Plaintiff has not engaged in substantial gainful employment since May 1, 2012. *See id.* at 22. The ALJ determined that Plaintiff had the severe impairments of "bipolar disorder, depressive disorder, mood disorder, [PTSD], chronic obstructive pulmonary disease, and allergic rhinitis." *See Id.* The ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404." *See id.* at 23. He also found that "[b]ecause the [Plaintiff's] mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." *See id.* at 24. The ALJ determined that Plaintiff has the "residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform simple, unskilled, low stress work[.]" *See id.* at 25. Lastly, the ALJ found that the Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." *See id.*

**C.     Analysis**

*1. The ALJ erred by improperly determining Plaintiff's mental and physical RFCs*

Plaintiff argues, and Defendant concedes, that a remand is necessary because the ALJ failed to provide a reason for excluding the evaluation from NP Halse and LMSW Keller. *See* Dkt. No. 18 at 20-21; Dkt. No. 20 at 5-7. They both argue that the proper course is to direct that this case be remanded to the ALJ so that the evidence can be re-weighed and the record may be developed as needed. See id. "Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical source' and from 'non-medical sources' who have seen the claimant in their professional capacity." Social Security Ruling 06-03p, Titles II and XVI:II

14

And XVI: Considering Opinions And Other Evidence From Sources Who Are Not "Acceptable Medical Sources" In Disability Claims; Considering Decisions On Disability By Other Governmental And Nongovernmental Agencies, 2006 WL 2329939, *6 (Social Security Administration August 9, 2006) ("SSR 06-03p").

In *Warren v. Astrue*, the court found that the ALJ's dismissal of an opinion from the plaintiff's social worker did not accurately reflect the law, and moreover, that "[t]he opinions of non-medical sources who nevertheless have a relationship with a claimant in their professional capacity are to be considered by an ALJ." *Warren v. Astrue*, No. 09-CV-6217, 2010 WL 2998679, *4 (W.D.N.Y. July 27, 2010). Similarly, in *White v. Commissioner of Social Security*, the court found the ALJ had erred by failing to give "appropriate weight to the opinion of plaintiff's social worker," and, although technically not an acceptable medical source, it should have been considered. *White v. Comm'r of Soc. Sec.*, 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (citing 20 C.F.R. § 416.913(d)); *see also Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (finding the opinion of the plaintiff's social worker was "entitled to some consideration"). Additionally, "[t]he RFC must take into account the '[t]otal limiting effects' of all of a claimant's impairments, even those that are not severe, and the ALJ must consider 'all of the medical and nonmedical evidence, including' the information regarding the claimant's mental abilities as outlined in § 404.1529(c). An RFC finding must also represent a function-by-function assessment of a claimant's abilities." *Simpson v. Astrue*, No. 11-CV-6500JWF, 2013 WL 4495090, *8 (W.D.N.Y. Aug. 19, 2013) (quoting 20 C.F.R. §§ 404.1529(e), 404.1545, 416.945).

Acceptable medical sources "include[ ] treating sources, nontreating sources, and nonexamining sources." 20 C.F.R. §§ 404.1502, 416.902. "In addition to evidence from 'acceptable medical sources' we may use evidence from 'other sources' as defined in 20 CFR

15

404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at 2 (Aug. 9, 2006). Section 404.1513(a) of Title 20 of the Code of Federal Regulations lists the acceptable sources that can be considered to determine whether an individual has a medically determinable impairment(s). *See also* 20 C.F.R. 416.913(a). Section 404.1513(d) of the regulations lists the other sources that may be considered as evidence to establish the severity of the individual's impairment(s) and how it may affect their ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d). This list includes "nurse-practitioners" and "[p]ublic and private social welfare agency personnel." 20 C.F.R. §§ 404.1513(d)(1),(3), 416.913(d)(1),(3). Evidence from physicians, psychologists, or other acceptable medical sources that attests to the severity of the impairment(s) and what the individual can still do despite the impairment(s) is defined as a medical opinion. 20 C.F.R. §§ 404.1527(a), 416.927(a). The medical opinions in the records will always be considered. 20 C.F.R. §§ 404.1527(b), 416.927(b). The ALJ is entitled to rely on other sources, such as non-medical sources, for a determination of the severity of an impairment(s) and the functional limitations of an individual, but not where it diagnoses the individual with a particular condition, which must be left to medical sources only. *See Luffman v. Comm'r of Soc. Sec*. No 12-cv-317, 2013 WL 1386639, *7 (N.D.N.Y. Mar. 14, 2013); *see also Simpson*, 2013 WL 4495090, at *9.

The examinations by NP Halse and LMSW Keller should have been considered, and, because they were not, the proper course is to remand the case to the ALJ so the record can be fully developed.

### *2. The ALJ improperly resorted to the grid instead of a vocational expert.*

Plaintiff contends that the ALJ should have turned to a vocational expert for the

16

determination of the work available in the national economy that Plaintiff could perform, and because he did not remand is necessary. *See* Dkt. No. 18 at 26. Defendant concedes that remand is warranted as well, and requests that the Court order further administrative proceedings on this issue. *See* Dkt. No. 20 at 7-8. Since remand is necessary at step three of the sequential process, that makes the determinations at steps four and five irrelevant and there is no need to rule upon the ALJ's decision to resort to the grid instead of a vocational expert at step five of the process. However, it bears mentioning that where the ALJ has "no basis to conclude that the Commissioner met its burden of demonstrating" that an individual meets the RFC to perform "nonexertional demands of sedentary work," even if they correctly determine the individual can perform the "exertional demands of sedentary work," it is inappropriate to "resort to the grids, in lieu of testimony from a vocational expert," to determine disability. *Rosa*, 168 F.3d at 82. Additionally,

> application of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis. If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations" then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments. Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate.

*Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986) (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)).

### *3. This court lacks jurisdiction over the reopening of a previous claim for benefits.*

Plaintiff argues that the commissioner erred in failing to review the termination of benefits. As stated previously, upon review, the ALJ's decision is only set aside when based on

17

legal error or when it was not supported by substantial evidence. *Berry*, 675 F.2d at 467; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The Court's review of the Commissioner's final decision is not conducted *de novo*, but rather "a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citation omitted); *see also Wagner v. Secretary of HHS*, 906 F.2d 856, 860 (2d Cir. 1990) (citation omitted). Furthermore, "[a]s a general rule, federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Califano v. Sanders*, 430 U.S. 99, 107-09 (1977)).

However, "federal courts may review the Commissioner's decision not to reopen a disability application in two circumstances: where the Commissioner has constructively reopened the case and where the claimant has been denied due process." *Id.* at 180. Here, the case has not been constructively reopened and Plaintiff is not claiming that she was denied due process. The ALJ stated very clearly that the evidence supported the finding that the Plaintiff failed to appeal the decision to terminate her benefits, therefore he considered the period of disability from March 2005, to May 2012, to be "a matter of administrative finality." *See* Dkt. No. 10-2 at 20.

### *4. The ALJ is not precluded from giving controlling weight to Dr. Harding's opinion*

Plaintiff contends that the ALJ should not have assigned great weight to Dr. Harding's opinion because he did not examine Plaintiff, and his opinion was not based on the entire medical record. *See* Dkt. No. 18 at 24. First, the ALJ's determination of Plaintiff's disability is only being considered "from the day after her benefits were terminated, May 1, 2012," to February 21, 2014. *See* Dkt. No. 10-2 at 20. Second, the opinion of a treating physician is not afforded controlling weight where the treating physician's opinion is contradicted by other substantial evidence in the

18

record, such as the opinions of other medical experts. *See Williams v. Comm'r of Soc. Sec.*, 236 Fed. Appx. 641, 643-44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)). Lastly, when an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including the following: the frequency of the examination and the length, nature and extent of the treatment relationship; the evidence in support of the treating physician's opinion; the consistency of the opinion with the record as a whole; whether the opinion is from a specialist; and other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c).

Dr. Harding did not personally examine Plaintiff, yet the ALJ gave great weight to his opinion stating only that it was "supported by the treating and examining source evidence." *See* Dkt. No. 10-2 at 27; Dkt. No. 10-3 at 4-23. Although the ALJ need not explicitly consider each of the factors listed in 20 C.F.R. § 404.1527(c), it must be clear from the ALJ's decision that a proper analysis was undertaken. *See Petrie v. Astrue*, 412 Fed. Appx. 401, 406 (2d Cir. 2011). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 Fed. Appx. 74, 77 (2d Cir. 2012) (citations omitted).

Since it was not explained why controlling weight was given to Dr. Harding, on remand the ALJ should fully address this issue. "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources . . . ." 20 C.F.R. §§

404.1527(e)(2)(ii), 416.927(e)(2)(ii).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the decision denying disability benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 7, 2015
      Albany, New York

_Mae A. D'Agostino_
U.S. District Judge